**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**ORLANDO PEREZ-MARTINEZ,**

     **Plaintiff,**

**vs.**                           **Case No. 4:14cv146-WS/CAS**

**CORIZON HEALTH, INC.,
DR. CHARLIE E. RICHARDSON,
NURSE CAROL DALLAS,
and K. SHARIEFF,**

     **Defendants.**

_____/


## REPORT AND RECOMMENDATION

     After the close of discovery on October 23, 2015, ECF No. 54,

Defendant Sharieff filed a motion for summary judgment, ECF No. 62, and

evidence in support of the motion, ECF Nos. 63, 69.  Defendants Corizon,

Richardson, and Dallas filed a separate summary judgment motion, ECF

No. 66, supported by a separate statement of material facts, ECF No. 67.

Pro se Plaintiff Orlando Perez-Martinez was advised of his obligation to

respond to Defendants' summary judgment motions, ECF No. 68, and

given extensions of time to do so.  ECF Nos. 71 and 74.

Plaintiff filed a response to Defendant Sharieff's summary judgment motion and medical records, stating his agreement "that summary judgment <u>in favor</u> of <u>Defendant Sharieff</u> is appropriate." ECF No. 72 at 1. Accordingly, the uncontested motion for summary judgment filed by Defendant K. Sharieff, ECF No. 62, should be granted.

Plaintiff filed a response in opposition to the summary judgment motion filed by Defendants Richardson, Dallas, and Corizon. ECF No. 76. He did not, however, file any additional evidence.

## I.    Allegations of the Complaint[1]

On December 12, 2012, Plaintiff was assaulted by another inmate at Jefferson Correctional Institution. ECF No. 29 at 6. Plaintiff was taken to medical for treatment, but Defendant Dallas, a nurse, allegedly refused to wait for an interpreter to translate Plaintiff's complaints. *Id.* Nurse Dallas did not provide any medical attention to Plaintiff and he was taken to confinement. *Id.* Plaintiff alleges that between December 12, 2012, and January 25, 2013, he repeatedly requested medical treatment, "yet received none." *Id.* Plaintiff also contends that he submitted several requests for sick call while in confinement, but the requests were "never

---

[1] The operative pleading is the third amended complaint, ECF No. 29.

processed" because of Corizon's policy to "ignore any sick call request not writen [sic] in English."  *Id.* at 6-7.

Once Plaintiff was released from confinement, he was able to sign up for sick call with assistance from another inmate.  ECF No. 29 at 7.  On February 4, 2013, Plaintiff was examined by Defendant Dr. Richardson and an x-ray was ordered.  *Id.*  The x-ray was taken on February 12, 2013, and revealed a fracture.  *Id.*  Plaintiff alleged that a recommendation was made to have a C.T. scan of Plaintiff's head.  However, Plaintiff was not given a C.T. scan until September 2013.  *Id.*  Thereafter, Plaintiff was also given a M.R.I. on December 12, 2013.  *Id.*  Dr. Williams (not a Defendant) recommended "close follow up" of Plaintiff, but Plaintiff alleges that after he was returned to Jefferson C.I., Defendant Richardson did not provide any follow up treatment.  *Id.* at 8.

In April 2014, Plaintiff began having seizures.  ECF No. 29 at 8.  He alleges that despite Defendants Richardson and Dallas having examined him, "no medical treatment was administered."  *Id.*  Plaintiff was, however, transferred back "to R.M.C. to be seen by a specialist . . .  on April 25, 2014."  *Id.*  Doctor Gama (also not a Defendant) and two other doctors reviewed Plaintiff's medical records, and submitted a "report," but again,

Plaintiff states that no medical treatment was provided and he was returned to Jefferson C.I.  *Id.*   Plaintiff had an additional seizure in May 2014, followed by another seizure in September 2014, and was transferred again to R.M.C.  *Id.* at 9.  Dr. Gama prescribed anti-seizure medication, and Plaintiff was returned to Jefferson C.I.  *Id.*

Plaintiff was then treated by Dr. Sharieff, who replaced Defendant Richardson.  *Id.* at 9.  Plaintiff's anti-seizure medication was changed to a more cost efficient medication.  Plaintiff contends he suffered numerous side effects and requested that his medication be returned to that which was prescribed by Dr. Gama.  *Id.*  Plaintiff's medication was then discontinued.  *Id.*  Two days later, Plaintiff alleges he had another seizure on September 28, 2014.  *Id.*  Plaintiff was stabilized, "but no further treatment was ordered."  *Id.*  Plaintiff contends Defendants have been deliberately indifference to his serious medical needs.  *Id.* at 9-10.

## II.    Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[2] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case."  Id. at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of

evidence" is not enough to refer the matter to a jury).  The Court must

decide "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L.

Ed. 2d 202 (1986).  All "justifiable inferences" must be resolved in the light

most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct.

at 2578 (noting the distinction "between evidence of disputed facts and

disputed matters of professional judgment."),[3] but "only if there is a

'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557

U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where

the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec.

Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).  In

addition, even if a factual dispute exists between the parties, "[o]nly factual

---

[3] Noting that deference must be given "to the professional judgment of prison administrators," the Court stated that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." Beard, 548 U.S. at 530, 126 S. Ct. at 2578 (citing Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003)).

disputes that are material under the substantive law governing the case will preclude entry of summary judgment." <u>Lofton v. Sec'y of Dep't of Children & Family Servs.</u>, 358 F.3d 804, 809 (11th Cir. 2004) (citing <u>Anderson</u>, 106 S.Ct. at 2510)).

## III.   The relevant Rule 56(e) evidence[4]

Nurse Dallas is a Licensed Practical Nurse, employed by Corizon, and assigned to provide patient care to inmates housed at Jefferson Correctional Institution.  ECF No. 60-3 at 2 (Dallas Declaration).  Nurse Dallas saw Plaintiff on December 16, 2012, when he was brought to medical for an assessment and evaluation following "an inmate on inmate altercation" and the use of chemical agents by prison staff.  *Id.* at 3.  The altercation occurred at 4:45 a.m. and Nurse Dallas examined him at 5:22 a.m., after he was given a shower to remove the chemical agents.  *Id.*; *see also* ECF No. 60-2 at 77 (pg. 288 of Ex. A-1).[5]  Nurse Dallas noted that Plaintiff had abrasions and bruises on both knees, a bruise on his right cheek, and a 1.5 cm. laceration on the left side of his head, which she

---

[4] Plaintiff did not submit any additional evidence but has relied on Defendants' records.  ECF No. 77.

[5] Because Plaintiff, as a prisoner, does not have access to the electronic record, exhibits are referenced by both the electronic docket and the hard copy, in parenthesis.

noted was superficial, with minimal bleeding.  ECF No. 60-3 at 3; *see also*

ECF No. 60-2 at 76 (pg. 283 of Ex. A-1).  The "Emergency Room Record"

reveals Plaintiff complained of knee pain, and mild pain on the left side of

his head.  ECF No. 60-3 at 3; *also* ECF No. 60-2 at 77 (pg. 288 of Ex. A-1).

The Record also reveals Plaintiff arrived in ambulatory condition, alert,

responding to questions verbally, and oriented to person, place, time, and

situation.  *Id.*  Nurse Dallas "conducted a PERRLA check, or neurological

eye check to test how the nervous system [was] functioning," and noted

"his respiration was even and unlabored, with clear lungs," and his heart

was beating at a regular rate and rhythm.  *Id.*  The Record indicates "no

acute distress [was] noted."  ECF No. 60-2 at 77 (pg. 288 of Ex. A-1).

Nurse Dallas "cleansed the areas of injury, provided him with Ibuprofen for

pain and discomfort, and instructed [Plaintiff] to notify staff of any changes,

or to use sick call for non-emergent complaints."  ECF No. 60-3 at 3; ECF

No. 60-2 at 77 (pg. 288 of Ex. A-1).  Plaintiff's response to treatment was

"good."  *Id.*

Nurse Dallas states in her affidavit that Plaintiff "appeared to have no

trouble responding to [her] questions."  ECF No. 60-3 at 3.  At "no time" did

she believe Plaintiff "did not adequately relay his complaints or wish to see

a doctor." *Id.* In her medical opinion, Plaintiff's situation "did not require notification of a clinician; otherwise [she] would have ensured that" Plaintiff was examined by "an upper level provider." *Id.* at 3-4.

Dr. Richardson first saw Plaintiff on February 5, 2013, for complaints of right ear pain. ECF No. 60-1 at 3 (Richardson Declaration). Another inmate was present with Plaintiff as an interpreter. ECF No. 60-2 at 28 (pg. 182 of Ex. A-1). Plaintiff indicated he had been in a fight with another inmate and was experiencing pain and dizziness. ECF No. 60-1 at 3; ECF No. 60-2 at 28 (pg. 182 of Ex. A-1). Dr. Richardson performed a thorough examination and found Plaintiff "appeared to be well-developed, well-nourished, and in no acute distress." ECF No. 60-1 at 3. Dr. Richardson performed a PERLA test (pupils equal reactive light and accommodation), which was normal. *Id.* Plaintiff's "nose septum in midline tympanic membrane (ear drum) revealed within normal limits; jaw movement was without local tenderness; [and] his gait was normal." *Id.* Dr. Richardson concluded "there were no abnormalities in Cranial II-XII (cranial nerves 2-12)." *Id.* Dr. Richardson made a note of "contusion" in Plaintiff's Chronological Record of Health Care. ECF No. 60-1 at 3; ECF No. 60-2 at 28 (pg. 182 of Ex. A-1).

Dr. Richardson also "ordered an x-ray and a special consult with optometry[6] to rule out injury."  ECF No. 60-1 at 4.  Dr. Richardson "did not observe any clinical presentations of trauma or any indication that [Plaintiff] was in acute pain or had suffered a severe trauma during the encounter." *Id.*  However, because of Plaintiff's history of "symptoms caused by a hit from a lock in a sock and because [his] examination of [Plaintiff] did not provide an "objective reason for his earache," Dr. Robinson "felt that an x-ray as well as a consultation with optometry might assist in determining the objective cause or causes of his symptoms."  *Id.*  Dr. Richardson did not prescribe any pain medication at that time because the "lack of abnormal physical findings including no neurological deficit and no localized tenderness . . . did not warrant a prescription for pain medication."  *Id.* at 3. Non-narcotic pain medications were available to inmates in the dormitory and in the commissary, should Plaintiff have needed such.  *Id.*

---

[6] It appears that the optometry consult was requested on February 5, 2013.  ECF No. 65-3 at 32 (pg. 238 of Ex. A-1).

Plaintiff was x-rayed on February 12, 2013.[7]  ECF No. 60-1 at 4.  The x-ray findings were: "separation of right frontozygomatic suture and fracture of zygomatic arch; no fracture of inferior orbital rim and plate."  ECF No. 69-19 at 21 (ECF No. 69, Section 19, pgs. 483-484); *see also* ECF No. 60-1 at 4.  The radiologist advised that a CT scan was needed for "further evaluation."  ECF No. 69-19 at 21 (ECF No. 69, Section 19, pg. 483).

Dr. Richardson reviewed the x-ray report and had a follow-up appointment with Plaintiff on February 15, 2013.  ECF No. 60-1 at 4-5. Dr. Richardson states that after reviewing the report and Plaintiff's charge, he "recommended that a CT scan and consult with an oral surgeon be made for further assessment."  *Id.* at 5 (citing Ex. A-1 at 181, 276).  On that same day, Dr. Richardson called the Chief of Dental Services[8] at the Reception and Medical Center [RMC] in Lake Butler, Florida, to "ensure and expedite" Plaintiff's consultations and treatment.  ECF No. 60-1 at 5.

---

[7] The complete medical file for Plaintiff was been sealed and filed as Document 69, with 56 separate sections.  All radiology reports were submitted in Section 19.  ECF No. 69-19 at 21 (Section 19, designated "DOC Chart: 000483-484").  Additionally, Defendants' exhibits were filed first as document 60, and then corrected copies of the medical exhibits were filed again as document 65.

[8] The affidavit does not explain why Dr. Richardson contacted dental services for a consultation on February 15, 2013, when a request was made on February 5, 2013, to have a consultation with optometry.  ECF No. 60-1 at 4-5; ECF No. 60-2 at 28 (Pg. 182 of Ex. A-1).

Dr. Richardson states that also faxed the x-ray report to RMC to facilitate Plaintiff's care and treatment.  *Id.*  Dr. Richardson states that a consult request for Plaintiff to have a CT scan was submitted on February 15, 2013.[9]  *Id.* (citing Ex. A-1 at 181).  Additionally, the consult request for Plaintiff to be examined by an oral surgeon was placed on February 19, 2015.  ECF No. 60-1 at 5.

Plaintiff was transferred to RMC for the consultation with an oral surgeon.  ECF No. 60-1 at 5.  Plaintiff returned to Jefferson C.I. on February 25, 2013, and was seen in sick call by SLPN Davis the following day to evaluate his continuing complaints of dizziness, headaches, visual disturbance, pain and tingling.  *Id.*; *see also* ECF No. 60-2 at 25 (pg. 178 of Ex. A-1).  The medical records indicate there was no swelling and Plaintiff walked with a "steady gait."  ECF No. 60-1 at 5-6; *see also* ECF No. 60-2 at 25 (pg. 178 of Ex. A-1).  Nurse Davis noted that Plaintiff should be "referred

---

[9] Dr. Richardson's affidavit states that the Chief of Dental Services did not recommend that the CT scan be performed, notwithstanding the recommendation from Dr. Richardson and the radiologist.  ECF No. 60-1 at 5.  The Chief of Dental Services "believed that an oral surgeon was best suited to determine which x-rays and scans were necessary to assess" Plaintiff.  *Id.*  Although the medical records include a notation on February 15, 2013, that "consult" was submitted, ECF No. 65-3 at 3 (pg. 181), no request for a CT scan during that time period has been located.  *See* ECF Nos. 69-15 at 61-64, ECF No. 69-19 at 21-26.  Rather, it appears ARNP Alzora Williams requested a CT scan in September 2013.  ECF No. 69-19 at 24-26.  Plaintiff has argued that Dr. Richardson did not order a CT scan.  ECF No. 76 at 2.

to clinician for further evaluation and treatment."  ECF No. 60-2 at 25 (pg. 178 of Ex. A-1).  She advised Plaintiff that he could take over the counter medications for pain, but could also return to sick call.  *Id.*

Dr. Richardson reviewed Plaintiff's chart on February 27, 2013, and placed a follow up call to the Chief of Dental Services.  ECF No. 60-1 at 6.[10]  Dr. Richardson was informed that Plaintiff had been examined by an oral surgeon on February 25, 2013, and that a follow-up was scheduled for March 3, 2013.  *Id.*; *see also* ECF No. 65-3 (Pg. 178 of Ex. A-1).[11]

On March 4, 2013, Dr. Richardson once again saw Plaintiff who indicated he was still experiencing dizziness and heaviness in his eye.  ECF No. 60-1 at 6.  Dr. Richardson told Plaintiff that "his zygomatic fracture [was] an older injury and that the oral surgeon indicated that no further treatment was needed."  *Id.*  Dr. Richardson also advised Plaintiff that in his opinion, an optometry consultation "would be the next step" in assessing

---

[10] Dr. Richardson's affidavit contains a scrivener's error in paragraph 19.  All dates there are in 2015, but those days should be in 2013 instead.  ECF No. 60-1 at 6.

[11] A slightly cleaner copy of Exhibit A-1, originally filed with document 60, was filed with document 65.  That version of the Exhibit is referenced hereafter.  An incidental notation in the Chronological Record of Health Care reveals that Plaintiff had returned back "from RMC day trip" and his chart had been "referred to clinician."  ECF No. 65-3 (pg. 178 of Ec. A-1).  There is not a notation for March 3rd which suggests Plaintiff did not have the follow-up appointment.

his complaints.  *Id.*  Dr. Richardson submitted an Optometry consult in

February 2013.  ECF No. 69-15 at 62 (pg. 392).

Plaintiff was seen by the optometrist on March 14, 2013.  ECF No.

60-1 at 7; ECF No. 69-15 at 63 (pg. 393).  The examination revealed no

significant changes in eyesight, although Plaintiff was given a new

prescription for bifocals.  ECF No. 60-1 at 7.  Plaintiff received his

eyeglasses on April 18, 2013.  *Id.*

On May 24, 2013, Plaintiff was seen by Nurse Davis[12] in sick call for

his continuing complaints of "headaches, dizziness, and visual

disturbance."  ECF No. 60-1 at 7; *see also* ECF 69-10 (pg. 205).  Nurse

Davis noted that Plaintiff had recently been issued glasses on April 18,

2013, and had been seen by Dr. Richardson on March 4, 2013.  ECF No.

65-2 at 48 (Pg. 175 of Ex. A-1); ECF 69-10 (pg. 205).  The health care

records also include a notation by Nurse Davis that Plaintiff should be

referred to clinician for further evaluation.  *Id.*

---

[12] Nurse Davis made a notation in Plaintiff's Chronological Record of Health Care that Plaintiff "speaks very little English."  ECF No. 65-2 at 48 (Pg. 175 of Ex. A-1). There is no indication that an inmate interpreter was present as occurred on March 4, 2013, when Plaintiff was examined by Dr. Richardson.  *See* ECF No. 65-2 at 50 (Pg. 177 of Ex. A-1).

It does not appear, however, that a referral was made because Plaintiff was not seen again until he went to sick call on September 16, 2013, and was examined by Nurse Davis.  ECF No. 65-2 at 47 (pg. 173 of Ex. A-1); *see also* ECF No. 69, Exhibit 10.[13]  The records reveal that Plaintiff submitted inmate requests and grievances in August and September, but no medical examination is charted.  During his sick call visit on September 16th, Plaintiff again complained of ongoing headaches since he was hit in the head in December 2012, and said his right eye felt "heavy."  *Id.*  Plaintiff was examined, directed to take over the counter Ibuprofen as needed, and another entry was made to refer him to the clinician for further evaluation.  ECF No. 69-10 at 103; ECF No. 65-2 at 47 (pg. 173 of Ex. A-1).  Nurse Davis instructed Plaintiff to return to sick call if his symptoms worsened.  *Id.*

On September 26, 2013, Plaintiff was seen by Alzora Williams, ARNP, for complaints of headaches, right eye discomfort, and dizziness.  ECF No. 65-2 at 46 (pg. 170 of Ex. A-1).  Plaintiff was accompanied by a Spanish interpreter.  *Id.*  Ms. Williams recommended Plaintiff have a CT

---

[13] While only portions of Plaintiff's Chronological Record of Health Care were submitted with the summary judgment motion filed by Defendants Corizon, Richardson, and Dallas, the complete record was filed as ECF No. 69.

scan and directed a follow up in 45 days.  *Id.*; *see also* ECF No. 69-10 at

104 (pg. 208).  On October 1, 2013, a CT scan request was faxed to the

Regional Medical Center [hereinafter "RMC"] in Lake Butler, Florida.  ECF

No. 65-2 at 45 (pg. 169 of Ex. A-1); ECF No. 69-10 at 105 (pg. 209).

The CT scan requested by ARNP Williams was performed on

October 9, 2013.  ECF No. 60-1 at 8; ECF No. 69-19 at 24 (pg. 211).  The

radiologist's report indicated "a cortical and subcortical air low attenuation

involving the left frontal lobe, with an irregular thin rim of increased

attenuation."  ECF No. 69-19 at 24.  The report found "no evidence of mass

effect or vasogenic edema."  *Id.*  However, there was a "fracture of the right

zygomatic arch which appeared "chronic."  *Id.*  The radiologist also

identified two areas which might represent cerebral contusions.  ECF No.

69-19 at 24; ECF No. 65-3 at 40 (Pg. 271 of Ex. A-1).  The radiologist

recommended an MRI and neurological evaluation.  *Id.*  On October 11,

2013, Dr. Luis Quinones noted the CT scan findings and requested a brain

MRI be performed.  ECF No. 65-3 at 39 (Pg. 270 of Ex. A-1); ECF No. 65-2

at 42 (Pg. 165 of Ex. A-1); ECF No. 69-10 at 107 (pg. 211).[14]

---

[14] Dr. Richardson's affidavit indicates that Plaintiff returned to sick call on October
26, 2013, with more complaints of headaches and eye discomfort.  ECF No. 60-1 at 8
(citing to Ex. A-1, p. 170).  The undersigned has searched the medical records and

Plaintiff was again seen by ARNP Williams on November 7, 2013. ECF No. 60-1 at 8.  Plaintiff was complaining of hip and knee pain after falling while at RMC for his CT scan.  *Id.*; ECF No. 69-10 at 110 (pg. 214). Ms. Williams noted the CT scan findings which suggested "contusions" and she requested an MRI and neurology consultation as suggested by the radiologist.  *Id.*

An urgent request for a brain MRI was faxed on November 7, 2013. ECF No. 69-15 at 64-65 (Pg. 394-395); *see* ECF No. 69-10 at 111.  It appears that an MRI with and without gadolimium was performed on December 12, 2013, at RMC.  ECF No. 60-1 at 8; *see also* ECF No. 69-19 at 28 (Pg. 490).  The findings were "compatible with a large arteriovenous malformation involving the left frontal lobe."  ECF No. 69-19 at 28 (Pg. 490).  Dr. Franco, the radiologist, recommended a neurosurgical consultation.  *Id.*

Dr. Richardson explained in his affidavit that "arteriovenous malformations (AVMs) are defects of the circulatory system that are generally believed to arise during embryonic or fetal development or soon

---

cannot locate an October 26, 2013, appointment.  Page 170 of Exhibit A-1 references a prior appointment on September 26, 2013, which has already been noted. ECF No. 65-2 (Pg. 170 of Ex. A-1).

after birth." ECF No. 60-1 at 10.  AVMs "are comprised of snarled tangles of arteries and veins." *Id.*[15]

A notation in Plaintiff's Chronological Record of Health Care dated December 16, 2013, indicates Plaintiff was seen by Dr. Gama in neurology. ECF No. 69-10 at 112 (pg. 216); ECF No. 69-15 at 65 (pg. 395).[16]  The neurologist's impression was that Plaintiff had "post traumatic vertigo, brain contusions, and recurrent episodes of disorientation."  ECF No. 60-1 at 9 (citing to Ex. A-1, pg. 241).  Dr. Gama noted that Plaintiff had a CT scan which was "abnormal."  ECF No. 69-10 at 65 (pg. 395).  The neurologist recommended "an MRI of the brain with and without contrast to rule out contusions, an EEG[17] to rule out seizures, a referral for physical therapy to

---

[15] The website for the Mayo Clinic explains that "[t]he arteries are responsible for taking oxygen-rich blood from the heart to the brain. Veins carry the oxygen-depleted blood back to the lungs and heart. A brain AVM disrupts this vital process.  An arteriovenous malformation can develop anywhere in your body but occurs most often in the brain or spine. Even so, brain AVMs are rare and affect less than 1 percent of the population.  The cause of AVMs is not clear. Most people are born with them, but they can occasionally form later in life. They are rarely passed down among families genetically.  Some people with brain AVMs experience signs and symptoms, such as headache or seizures. AVMs are commonly found after a brain scan for another health issue or after the blood vessels rupture and cause bleeding in the brain (hemorrhage)." http://www.mayoclinic.org/diseases-conditions/brain-avm/home/ovc-20129992.

[16] Although document 69 contains a section entitled "Neurology clinic notes," there is no record of any examination of Plaintiff in 2013.  ECF No. 69-14.

[17] The medical records reveal the EEG was "not done."  ECF No. 69-15 at 69 (pg. 399).  An EEG was eventually conducted on June 2014 after Plaintiff had two seizures. ECF No. 19-20 (Section 20, pg. 499).  That EEG was "Abnormal" and "[c]linical and

perform a Dix-Hallpike test,"[18] and for Plaintiff to return for follow-up in one

month.  ECF No. 60-1 at 9 (citing to Ex. A-1, pg. 241).

The following day, December 17th, the health record includes a

notation stating: "urgent neurosurgery consult submitted."  ECF No. 69-10

at 112 (Pg. 216).  The consultation request also stated "urgent," indicating

Plaintiff's condition (identified as "large AV malformation left frontal lobe")

was "chronic."  ECF No. 69-15 at 66 (pg. 396)).  Another notation in the

health records dated January 6, 2014, states: "M.D. chose to send [inmate]

to a neurosurgeon instead of neurology."  *Id.* at 113.

Plaintiff was examined by neurosurgeon Dr. William Friedman on

January 23, 2014, at Shands Hospital in Gainesville, Florida.  ECF No. 60-

1 at 9; *see also* ECF No. 65-3 at 17-19 (pgs. 222-224).  Dr. Friedman noted

that Plaintiff had a one-year "history of worsening headaches, nausea, and

dizziness."  ECF No. 65-3 at 17 (pg. 222).  Plaintiff reported no seizures,

weakness, or paralysis, but was experiencing right eye pain and blurred

vision.  *Id.*  Dr. Friedman performed a detailed physical examination, and

---

radiological correlation" of the EEG findings was recommended.  *Id.*

[18] A "Dix-Hallpike test determines whether vertigo is triggered by certain head
movements."  ECF No. 60-1 at 9, fn. 3.

took Plaintiff's medical history in Spanish. *Id.* at 18 (pg. 223). Dr.

Friedman viewed the brain MRI results which indicated a left frontal AVM

(arteriovenous malformation) and diagnosed treatment options with

Plaintiff. *Id.* at 19 (pg. 224). The notes reflect that after discussing risks

and benefits, and considering Plaintiff's "situation of incarceration," SRS

(stereotactic radio surgery) was chosen as the best option. *Id.* at 19-20

(pgs. 224-225). A request was submitted for authorization to perform the

SRS procedure and approved on April 8, 2014. *Id.* at 20 (pg. 225); *see

also* ECF No. 6.

The medical records reflect that on several occasions in February

and March 2014, Plaintiff complained of headaches and dizziness. ECF

No. 69-10 at 117-119 (pgs. 221-223). He also complained that the right

side of his head felt numb and he had experienced "episodes" of feeling

"tingly, like ants are crawling." *Id.* at 119 (pg. 223). On March 24, 2014,

Plaintiff reported to sick call complaining that his right eye hurt and felt

"heavy." ECF No. 69-10 at 122 (pg. 226). He was referred to the clinician

who examined him that afternoon. *Id.* at 122-123 (pg. 226-227). The

record does not reflect that any treatment was provided other than

renewing Plaintiff's low bunk pass. *Id.* at 123 (pg. 227).

On March 28, 2014, a notation was entered in his medical records stating: "unable to do MHITV. No interpreter available" and advising Plaintiff "does not speak English."  *Id.*  Another note on April 1, 2014, advised that Plaintiff reported to sick call "with a sick call request written in Spanish."  *Id.*  Nurse Blair did not speak or read Spanish, and Plaintiff "was not able to speak English."  *Id.*  The notation stated that the nurse was "unable to evaluate due [to] language barrier."  *Id.*  It was also noted that Plaintiff did not seem to be in "obvious distress."  *Id.*

Nurse Dallas saw Plaintiff on April 3, 2014, at approximately 1:45 a.m. for complaints of "headache, nausea, weakness, fatigue, and pressure behind his [right] eye."  ECF No. 60-3 at 4 (Dallas affidavit); ECF No. 65-2 at 31 (Pg. 117).  An inmate interpreter was present and helped provide information so that Nurse Dallas could assessed Plaintiff.  ECF No. 65-2 at 31.  Plaintiff was "admitted for 23 hour observation" in light of his history of AVM.  ECF No. 60-3 at 4.  Plaintiff's vital signs were taken and he appeared stable.  *Id.*  Nurse Dallas "placed an order for him to be seen" by Dr. Richardson and Plaintiff was directed to notify the nurses of any complaints."  ECF No. 60-3 at 4.

Nurse Dallas states in her affidavit that Plaintiff "did not complain of having a seizure" and she did not observe him have a seizure.  ECF No. 60-3 at 4.  Nurse Dallas states that she did not observe any clinical indication on April 3, 2014, that [Plaintiff] required emergent care or any other treatment" at that time.  *Id.*

At approximately 8:30 a.m. on April 3, 2014, Plaintiff was seen by Nurse Grant who noted that Plaintiff was "Spanish speaking but able [to] make gestures regarding pain/discomfort."  ECF No. 69-10 at 124 (pg. 228).  It was noted that Plaintiff was unable to stand due to dizziness and had an "unsteady gait."  *Id.*

Later that morning Plaintiff was seen by Dr. Richardson and LPN M. Linder.  ECF No. 60-3 at 4 (Dallas Declaration).  The medical record indicates Plaintiff was "uncooperative, would not follow my finger with eyes, did not do anything asked."  ECF No. 69-10 at 124 (pg. 228).  Plaintiff was able to communicate through an interpreter.  *Id.*  Dr. Richardson noted that Plaintiff was complaining that his legs were shaking and trembling.  ECF No. 60-1 at 10-11 (Richardson Declaration); ECF No. 65-2 at 32 (pg. 119).  Dr. Richardson reviewed the consult from Dr. William Friedman dated January 23, 2014, and "did not perceive any acute significant changes

neurologically."  ECF No. 60-1 at 10-11.  Plaintiff was released "from

observation to have follow-up with the neurosurgeon who had evaluated

him on January 23, 2014."  *Id.* at 11.  Dr. Richardson[19] noted that the

radiosurgery procedure was scheduled for April 22, 2014.  *Id.*

Plaintiff was transferred to RMC on April 15, 2014.  ECF No. 60-1 at

11.  "The radiosurgery was performed at Shands Hospital April 23, 2014."

*Id.*; ECF No. 65-2 at 28 (pg. 109); *see also* ECF No. 65-2 at 5-6 (pgs. 26-

27).  The medical records revealed "a left frontal arteriovenous

malformation involving the mid convexity with a nidus measure 3.2 x 2.7

cm in axial dimensions."  ECF No. 65-2 at 5 (pg. 26); ECF No. 69-19 at 33

(pg. 495).  The findings were "no flow related aneurysm," no evidence of

"acute hemorrhage or hydrocephalus," but there were "several small areas

of venous stenosis."  *Id.*

The records indicate that Plaintiff was brought to urgent care with a

seizure during the early morning hours of May 7, 2014.  ECF No. 69-15 at

69 (pg. 399); *see also* ECF No. 69-10 at 129, 131 (pgs. 233, 235).  Plaintiff

was admitted to the hospital and was started on Dilantin.  ECF No. 69-15 at

---

[19] Dr. Richardson's last date of employment at Jefferson Correctional Institution
was April 21, 2014.  *Id.*

69 (pg. 399).  It was recommended that Plaintiff have a EEG.  *Id.*  An "emergency" request was submitted on May 14, 2014, for a neurology consultation.  ECF No. 69-15 at 68 (pg. 398).

Plaintiff was seen by Dr. Gama, the neurologist on May 15, 2014.  ECF No. 69-10 at 133.  Labs and an EEG were ordered.  *Id.*  Labs were drawn on May 28, 2014, ECF No. 69-10 at 135 (pg 239), and June 5, 2014.  ECF No. 69-10 at 136 (pg. 240).  The EEG was done on June 10, 2014, and a notation was entered for a follow-up with Dr. Gama.  *Id.*  Plaintiff's follow-up appointment was on July 17, 2014, and a consult was recommended.  ECF No. 69-10 at 137 (pg. 241).  Plaintiff had another follow-up appointment with Dr. Gama on August 21, 2014, *Id.* at 143 (pg. 247), and additional appointments with medical personnel to review his anti-seizure medications on September 16, 2014, September 25, 2014, September 29, 2014, September 30, 2014.  *Id.* at 145-152 (pgs. 249-256).  Plaintiff was seen by neurologist Gama again on October 23, 2014.  ECF No. 69-10 at 152 (pg. 256).  Subsequent medical care has been provided by other persons not parties to this litigation.[20]

---

[20] Although some of the medical evidence detailed in this Report and Recommendation occurred after this case was initiated on March 17, 2014, *see* ECF No. 1, it has been listed to provide a thorough picture of the health care Plaintiff has

The Declaration submitted by Nurse Dallas explains that Corizon Policy P-E-01.00 "governs the provision of information to inmates with difficulty communicating, including inmates who purportedly do not speak English." ECF No. 60-3 at 4. Policy P-E-01.00 was attached to Nurse Dallas' Declaration. *See* ECF No. 60-4 (Ex. B-1). The policy states that "[i]nformation about the availability of, and access to, health care services is communicated orally and in writing to patients upon their arrival at the facility in a form and language the understand." *Id.* "[E]ach facility should institute procedures for having health care access translators for those inmates who do not understand English." ECF No. 60-3 at 5.

## IV.   Analysis

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994),

---

received.

abrogated on other grounds by <u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting <u>Laaman v. Helgemoe</u>, 437 F. Supp. 269, 311 (D. N.H. 1977)).  Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm." <u>Mann v. Taser Intern., Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009) (citing <u>Hill</u>, 40 F.3d at 1188-89, and <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003)).

The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm. <u>Farmer v. Brennan</u>, 114 S. Ct. 1970, 1978 (1994). Subjective recklessness, as defined in criminal law, is the standard which must be shown for an official's actions to rise to the level of deliberate indifference. *Id*. Deliberate indifference has been described as a culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a prisoner by depriving him of a basic human need. <u>Wilson v. Seiter</u>, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Combining the standards from <u>Farmer</u> and <u>Estelle</u>, the Eleventh Circuit has clarified that, ultimately, there are four requirements to bringing

an Eighth Amendment claim for the denial of medical care: "an objectively

serious need, an objectively insufficient response to that need, subjective

awareness of facts signaling the need, and an actual inference of required

action from those facts." Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000),

*cert. denied*, 531 U.S. 1077 (2001); Farrow v. West, 320 F.3d 1235, 1243

(11th Cir. 2003).  Put another way, once a prisoner shows that he has a

serious medical need, "the prisoner must prove three facts: (1) subjective

knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by

conduct that is more than mere negligence."  Brown v. Johnson, 387 F.3d

1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255

(11th Cir. 1999)).

Medical malpractice does not constitute deliberate indifference.

Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in

medical opinion between the prison's medical staff and the inmate as to the

latter's diagnosis or course of treatment support a claim of cruel and

unusual punishment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.

1991) (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)).  For

example, in Estelle, the prisoner received treatment for his back injury (bed

rest, muscle relaxants and pain relievers), but complained that more should

have been done in the way of diagnosis, such as an X-ray or other tests.

The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic techniques or forms of treatment--is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.

The Eleventh Circuit has held that "'[d]eliberate indifference' can include 'the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified.'"  Taylor v. Adams, 221 F.3d 1254, 1259–60 (11th Cir. 2000) (quoted in Harper v. Lawrence Cty., Ala., 592 F.3d 1227, 1235 (11th Cir. 2010) (internal quotation omitted)); *see also* Kuhne v. Florida Dep't of Corr., 618 F. App'x 498, 505 (11th Cir. 2015) (noting that "the relevant test is whether 'it is apparent that delay would detrimentally exacerbate the medical problem'").  In cases that challenge a Defendant's delay in providing medical care, several factors guide the Court's analysis: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay."  Goebert v. Lee

Cty., 510 F.3d 1312, 1327 (11th Cir. 2007) (citing Hill, 40 F.3d at 1189).

The Court held in Hill that "[a]n inmate who complains that delay in medical

treatment rose to a constitutional violation must place verifying medical

evidence in the record to establish the detrimental effect of delay in medical

treatment to succeed."  Hill, 40 F.3d at 1187.  "To survive summary

judgment, a plaintiff must show that the delay attributable to the

defendant's indifference likely caused the plaintiff's injury.  Goebert, 510

F.3d at 1327 (quoted in McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir.

2010)).

Not responding to complaints of pain is also an Eighth Amendment

violation and qualified immunity is unavailable.  McElligott v. Foley, 182

F.3d 1248 (11th Cir. 1999).  In McElligott, the court held that "a jury could

find that the medication provided to [the prisoner] was so cursory as to

amount to no care at all."  McElligott, 182 F.3rd at 1257.  Where a

defendant is aware that the pain medication provided is not treating the

prisoner's pain, and does nothing more to treat that pain or respond to a

deteriorating condition, a jury could find that defendant violated the Eighth

Amendment.  An "official acts with deliberate indifference when he or she

knows that an inmate is in serious need of medical care, but he fails or

refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255 (citing Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997)); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir.1989).

Further, when an inmate has received some medical attention or care and the dispute involves the adequacy of the care, federal courts are reluctant to second guess medical judgments and find an Eighth Amendment violation. Harris v. Thigpen, 941 F.2d 1495, 1507 (11th Cir. 1991). As stated in McElligott, "[h]esitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs" 183 F.3d at 1259 (citing Waldrop, 871 F.2d at 1035). Thus, liability cannot be avoided simply by pointing out that *some* medical care was provided, however cursory or insufficient that care.

Plaintiff has not specifically argued that Defendants ignored his complaints of pain. The medical evidence reveals that following the attack in December 2012, Plaintiff consistently complained of headaches. Defendants appear to have recommended only Ibuprofen for Plaintiff. Yet there is no evidence that Plaintiff advised Defendants that the Ibuprofen

was not strong enough to provide relief for his headaches.  The record also indicates that between March 2013 and September 2013, Plaintiff did not report to sick call at all.  When he did return on September 16, 2013, complaining of his ongoing headaches, he was again directed to take Ibuprofen as needed.  If Plaintiff's pain was not well managed, it was incumbent upon Plaintiff to say so.  Because the record lacks any evidence that Plaintiff so advised Defendants that his pain was not adequately addressed with Ibuprofen, an Eighth Amendment for the failure to respond to Plaintiff's complaints of pain cannot survive summary judgment.  As to this issue, summary judgment should be granted in Defendants favor.

Plaintiff's primary argument is that Defendants' delay in providing medical care violated his Eighth Amendment rights.  ECF No. 76 at 6-7. Examining the claim first against Nurse Dallas reveals that Plaintiff interacted with her on just two occasions.  First, Nurse Dallas saw Plaintiff on December 16, 2012, approximately 45 minutes after the fight.  The undisputed evidence is Nurse Dallas conducted a thorough examination of Plaintiff, finding a bruise on his right cheek, and a superficial laceration on the left side of his head, which had minimal bleeding.  Plaintiff complained of only mild pain on the left side of his head and was not in acute distress.

Nurse Dallas gave him Ibuprofen for pain.  She also stated in her affidavit that Plaintiff seemed to have no trouble responding to questions or expressing his complaints.  This encounter was neither insufficient or unconstitutional.

Plaintiff's second encounter with Nurse Dallas was on April 3, 2014, at approximately 1:45 a.m.  Plaintiff complained of a "headache, nausea, weakness, fatigue, and pressure behind his [right] eye."  An inmate interpreter was present with Plaintiff and helped provide information so Nurse Dallas could perform her assessment.  She took Plaintiff's vital signs and, noting his history of AVM, admitted him "for 23 hour observation" in the infirmary.  Nurse Dallas scheduled Plaintiff to be examined later than morning by Dr. Richardson and Plaintiff was directed to notify the nurses of any additional complaints.  Plaintiff did not appear to require emergent care or other treatment and Plaintiff has come forward with no evidence suggesting additional treatment should have been provided.  Summary judgment should be granted in favor of Nurse Dallas.

Plaintiff's claim against Dr. Richardson is based on five encounters. Dr. Richardson first examined Plaintiff on February 5, 2013, for complaints of right ear pain and dizziness.  Dr. Richardson performed a thorough

examination of Plaintiff and decided to order an x-ray and have a consult

with optometry.[21]  Both the consult and x-ray were taken within a short

amount of time and no significant delay.  The x-ray was taken on February

12, 2013 and Plaintiff was seen by the optometrist on March 14, 2013.

Dr. Richardson reviewed the x-ray report and had a second

encounter with Plaintiff on February 15, 2013.  After reviewing the x-ray

report, he intended to recommend a CT scan as suggested by the

radiologist.  The records support that intention, although it appears that no

action was taken on his recommendation for a CT scan.  There is,

however, no evidence that the failure to submit a request for a CT scan

was due to Dr. Richardson or other medical personnel.  Moreover, there is

no evidence suggesting that the failure to have a CT scan taken at that

time was due to anything more than negligence.  Even more crucial to

examining this claim, there is no evidence which demonstrates that Plaintiff

suffered any harm or the delay worsened his medical condition.

Dr. Richardson initiated a consult with an oral surgeon at RMC and

ensured that care was expedited.  When Plaintiff was returned to Jefferson

---

[21] It appears that the optometry consult was requested on February 5, 2013.
ECF No. 65-3 at 32 (pg. 238 of Ex. A-1).

C.I., he had a follow up appointment with Dr. Richardson two days later.

During this third interaction, Dr. Richardson reviewed Plaintiff's chart and

followed-up on Plaintiff's examination by the oral surgeon.

On March 4, 2013, Dr. Richardson saw Plaintiff for a fourth time and,

considering Plaintiff's ongoing complaints, advised Plaintiff that the

optometry consultation was next step in assessing his complaints.

Plaintiff was seen by the optometrist on March 14, 2013, and Plaintiff was

given a new prescription for bifocals.

Plaintiff's fifth interaction with Dr. Richardson was on April 3, 2014.

Dr. Richardson noted Plaintiff's complaints, but he also found Plaintiff was

"uncooperative" and "would not do anything asked."  Dr. Richardson

reviewed Plaintiff's chart, including the consult from Dr. Friedman, and

noted Plaintiff was scheduled to have the radiosurgery procedure on April

22, 2014.

Dr. Richardson had limited interaction with Plaintiff, but on each

occasion, there is no evidence that he did not provide him with medical

care.  Plaintiff's complaints were addressed and steps taken to resolve

Plaintiff's medical needs.  The only argument Plaintiff has raised in support

of his Eighth Amendment claim against Dr. Richardson is that he did not

order an MRI or CT scan.  ECF No. 76 at 6.  The CT scan was performed

on October 9, 2013, as requested by ARNP Williams, not Dr. Richardson.

Doing so indicated the need for the MRI, which revealed the left frontal

AVM.  SRS (stereotactic radio surgery) was eventually performed in April of

2014.  While Plaintiff experienced a delay, there is no evidence in this

record which reveals that the delay caused Plaintiff any harm.  Indeed,

Plaintiff did not experience seizures until *after* the surgery.  Moreover, the

medical evidence indicates Plaintiff's headaches and his ensuing difficulties

were a result of the AVM and not due to his being hit in the head with a

lock.  It appears that the assault led to the previously undiscovered AVM.

Plaintiff has not demonstrated that the care Dr. Richardson provided was

deliberately indifferent to his medical needs.  Therefore, summary

judgment should be granted in Dr. Richardson's favor.

Finally, Plaintiff raised a claim against Corizon concerning a policy

that sick call requests must be written in English.  While such a policy *could*

be problematic, Plaintiff has not provided any evidence which reveals he

was unable to receive medical care because of his language limitations.

Plaintiff was able to have persons interpret for him and receive medical

care.  Because Plaintiff has not shown that Corizon's policy denied him

medical care, summary judgment should be granted in Corizon's favor as well.

**RECOMMENDATION**

It is respectfully **RECOMMENDED** that Defendant Sharieff's uncontested motion for summary judgment, ECF No. 62, be **GRANTED**, and the summary judgment motion filed by the remaining Defendants, ECF No. 66, also be **GRANTED**.

**IN CHAMBERS** at Tallahassee, Florida, on July 21, 2016.


 s/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**